UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IRMA GOLDEN,

    Plaintiff,

v.

UAW-CHRYSLER NATIONAL
TRAINING CENTER,

    Defendant.

Case No. 17-13018
Honorable Laurie J. Michelson
Magistrate Judge Stephanie Dawkins Davis

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [35]**

Irma Golden was earning more than $55,000 when she left her job at the UAW-Chrysler National Training Center ("NTC") on May 31, 2017. She had worked at the organization for more than a quarter of a century in a variety of support-staff positions.

Golden did not leave on the best terms. During the preceding decade, she had complained to superiors that she was underpaid. And closer to her departure, she had lost some of her job responsibilities and had been assigned tasks that she found to be menial. These changes, according to Golden, amounted to a constructive discharge, giving her no choice but to quit.

Golden then sued the NTC. She alleges that the NTC discriminated against her based on age and sex and retaliated against her for engaging in protected activity. In particular, Golden argues that the NTC unlawfully paid her less than two similarly situated coworkers, Alfred Jones and Michelle Adams. The NTC moved for summary judgment, arguing that Golden cannot establish any of her claims.

For the reasons described below, the Court will grant the NTC's motion.

**I.**

The NTC, an organization jointly operated by UAW and Fiat Chrysler Automobiles, "provide[s] joint programs for the benefit of UAW-represented workers at FCA and provides extensive training to FCA employees represented by the UAW." (ECF No. 36-1, PageID.227–228.)

The specifics of Golden's role are central to this case, so the Court will discuss them in some detail. Golden, who holds a bachelor's degree, first joined the NTC as a security guard in 1990. (ECF No. 36-1, PageID.239; ECF No. 36-6, PageID.663.) Within several months, she moved to the organization's professional support staff. (*Id.*) Over the subsequent 26 years, in the roles of communication specialist and then training specialist, Golden had many job responsibilities. She worked on numerous conferences and trainings, such as the women's committee program and the employee assistance program, and coordinated a March of Dimes event. (ECF No. 36-6, PageID.682–684.) According to Golden, her functions included planning the agendas, arranging audiovisual technology, and registering participants. (ECF No. 36-6, PageID.686–687.) Eventually, she also became responsible for entering information into a database to track the list of training participants. (ECF No. 36-6, PageID.691–694.) The number of trainings dwindled, though, in the aftermath of Chrysler's 2009 bankruptcy and lack of new hires. (ECF No. 36-4, PageID.489–490; ECF No. 36-9, PageID.1062–1063.)

Position data questionnaires from three separate points during Golden's NTC career shed light on her job responsibilities. Golden's 1997 and 2005 questionnaires listed her title as "Training Specialist." (ECF No. 36-8, PageID.976; ECF No. 36-19, PageID.1198.) The 1997 report described her principal role as providing "on-going technical expertise and assistance for the development and implementation of NTC education and training programs," which included

"involvement with conferences, in-service training, small group sessions, and other activities." (ECF No. 36-19, PageID.1198–1200.) Golden's duties ranged from planning the agendas of the trainings to taking group pictures. (*Id.*) Her 2005 questionnaire summarized her position in roughly the same manner. (ECF No. 36-8, PageID.976–977.) One new addition was that she had become the program support administrator of TEDS, a "database designed to catalog and track NTC sponsored training." (*Id.*)

By 2015 Golden's title had changed slightly to "Training Specialist/[Learning Management System] Administrator." (ECF No. 36-7, PageID.969–974.) Golden estimated that she spent 60 percent of her time delivering trainings and developing training materials for various programs. (*Id.*) She worked the remainder of the time providing "[a]dmin responsibilities" for the Learning Management System (which tracked participant attendance), entering the information of program attendees into the ToolingU database, and assisting in research for other trainings. (*Id.*) The questionnaire confirmed that she had no budgetary duties or supervisory responsibilities. (*Id.*)

At some point in 2015, higher-ups at the NTC removed Golden from trainings that included solely UAW workers. (ECF No. 36-5, PageID.560–573.) For trainings such as UAW new-hire orientations, the sessions became facilitated by so-called Special Assigned and International Reps—FCA or UAW employees, respectively, who had been assigned temporarily to the NTC. (*Id.*) But as long as the training included some non-union employees, such as members of management, Golden continued to conduct the trainings as usual. (*Id.*) According to Delrico Loyd, who administered the training programs on behalf of UAW, this change aligned with the UAW philosophy that its members should be trained by UAW-appointed trainers, a group that did not include Golden. (ECF No. 36-5, PageID.535–536, 564–565.)

Golden was displeased by this change. On July 23, 2015, she sent an email to both Loyd and Helen Smith, Loyd's counterpart from the FCA side. Golden was "seeking explanation," she wrote, after learning that her "assignment to conduct the Diversity series training for New Hire Orientation has been eliminated without notification." (ECF No. 38-8, PageID.1289–1290.) In response, Scott advised Golden to discuss the matter with her direct supervisor, Lamar Harris. (*Id.*) When Harris then met with Golden, he assured her that he would "get to the bottom of it." (ECF No. 36-6, PageID.149.) When the two spoke several months later and nothing had happened, Golden decided to "just let it go." (*Id.*)

Around this time, Golden also was assigned to duties that she describes as "menial." (ECF No. 38, PageID.1240.) When she worked at the all-UAW training sessions, she provided support for the trainers rather than doing the trainings herself. (ECF No. 36-6, PageID.810.) For instance, Golden advanced the presenters' slides and checked whether the microphones had batteries. (*Id.*) At one weeklong conference, she sat in the back of the room and occasionally made photocopies or poured coffee for people. (ECF No. 36-6, PageID.812–813.) She also was invited to fewer staff meetings. (ECF No. 36-6, PageID.792–794.) But she continued to conduct various other trainings, including the employee assistance program and workplace violence program, as well as organizing the March of Dimes event. (ECF No. 36-6, PageID.802.)

In addition to Golden's frustration with her role, there also was the issue of her compensation. At several meetings from 2007 until her departure, she expressed to managers that she desired a larger paycheck. (ECF No. 36-2, PageID.266–269; ECF No. 36-4, PageID.411–414; ECF No. 36-5, PageID.553–556; ECF No. 36-6, PageID.735–736, 848–850.) As the record shows, the NTC's system for establishing wages was not simple. The board of the NTC, which controlled Golden's pay, had a system involving a third-party evaluator to set compensation ranges. (ECF

4

No. 36-1, PageID.229; ECF No. 36-2, PageID.264–265.) But the frequency of this process was erratic. (*Id.*) When a third party eventually presented a report in August 2015, the evaluator suggested that employees in Golden's category ("Specialists, Exec Asst") earn between $46,750 and $63,250, with a midpoint of $55,000. (ECF No. 36-1, PageID.237–239.) At the time, Golden made $26.54 per hour, which amounted to $55,203 per year. (*Id.*; ECF No. 38-6, PageID.1283.)

Golden also thought that the NTC had a bias against older employees and would ignore their needs. (ECF No. 36-6, PageID.822–823.) In a 2015 meeting with Loyd, she asked him to bring up the issue of her pay with UAW Vice President Norwood Jewell. (ECF No. 36-6, 820–21.) A month or two later, Loyd and Golden spoke again. (*Id.*) According to Golden, Loyd told her that management "want[ed] people to retire" and then asked her directly, "Have you ever thought about retiring?" (*Id.*) (Loyd says he "never" had any conversations about retirement with Golden (ECF No. 36-5, PageID.613), but the Court construes evidence in the light most favorable to Golden at the summary-judgment stage.)

About two years later, Golden indeed retired. Soon after, she filed this lawsuit.

## II.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Id.* at 451–52 (citing *Anderson*, 477 U.S. at 248). In evaluating a motion for summary judgment, this Court views the

evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

### A.

When claims under the Age Discrimination in Employment Act ("ADEA") are based on circumstantial evidence, the familiar three-step *McDonnell Douglas* framework applies. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). First, the plaintiff has the burden to present sufficient evidence to establish a prima facie case of discrimination. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 589 (6th Cir. 2014). To do so, the individual must demonstrate that "she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently from similarly situated, non-protected employees." *Id.*[1] If the plaintiff satisfies those criteria, the burden of production in the second step shifts to the employer, who must provide a legitimate, nondiscriminatory reason for its employment action. *See id.* at 590. Finally, if the employer meets its burden, the burden of production shifts back to the plaintiff to show that the employer's explanation is pretextual. *See id.*

In terms of an adverse employment action, an employee who quits her job instead of being fired can assert that she was constructively discharged. "To demonstrate constructive discharge, a

---

[1] Golden's brief proposed a substitute fourth factor: "circumstances that support an inference of discrimination," citing *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). But Blizzard cited a Supreme Court case that solely restated the law from a different circuit. *See* 698 F.3d at 283 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Under either fourth factor, however, the result is the same. As discussed in the text below, the facts do not support an inference of age discrimination.

plaintiff must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (alterations and internal quotation marks omitted). "Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case," but the Sixth Circuit considers the following factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (alteration in original) (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001)).

Here, the Court finds that no reasonable jury could conclude that the NTC deliberately made Golden's work conditions objectively intolerable, amounting to constructive discharge. Therefore, Golden is unable to establish that she suffered an adverse employment action, an element of her prima facie case.

Golden meets very few of the factors under *Laster*. She was not demoted. She suffered no loss of pay or benefits. She was not reassigned to a younger supervisor. Except for one alleged comment about whether Golden had thought about retirement, which was hardly badgering or harassing, nobody encouraged her to leave the NTC.

Golden bases her constructive discharge claim on having her duties reduced to menial tasks. (ECF No. 38, PagedID.1238–1241.) To be sure, some of Golden's duties were eliminated and she was asked to take on others. She no longer conducted certain trainings. She was sometimes

7

bored. And to her frustration, she was asked for one week to occasionally get coffee and sometimes had to operate someone else's slideshow. "Changes in employee responsibilities or authority, triggered by the company reorganization, without more, do not amount to intolerable conditions constituting constructive discharge." *Keller v. Allstate Ins. Co.*, 146 F. App'x 764, 765 (6th Cir. 2005). Golden's work conditions might have been difficult or unpleasant sometimes, but no reasonable jury could find that they were objectively intolerable—a high bar.

Nor were the occasional new tasks, like getting coffee, so "menial or degrading" that a reasonable person would have resigned. *Cf. Logan*, 259 F.3d at 571 (finding that a reasonable restaurant server would have considered mopping floors as a busser to be menial work); *Gibbs v. Voith Indus. Servs., Inc.*, 60 F. Supp. 3d 780, 800 (E.D. Mich. 2014) (holding that an employee was constructively discharged when she was reassigned to a work area that contained aggressive rats and a "wide variety of animal pests (and their associated wastes)"). Finally, Golden cannot demonstrate that her bosses "deliberately" changed some of her tasks "with the intention of forcing [her] to quit." *See Savage*, 665 F.3d at 739. Indeed, the record is undisputed that Golden's removal from certain trainings was due to a new policy that only UAW appointees should perform trainings solely for UAW members.

Even if Golden could demonstrate constructive discharge, her prima facie case still would fail. Golden alleges that the NTC treated her differently from and replaced her with Michelle Adams, a younger employee.

Adams, who was 31 years old when she was hired in early 2015, is a relative of Nancy Adams Johnson, Jewell's administrative assistant. (ECF No. 36-4, PageID.429; ECF No. 36-6, PageID.767; ECF No. 36-10, PageID.1102,1119.) Golden believed that Adams received preferential treatment because of her familial connection to Johnson. (ECF No. 36-6, PageID.790.)

8

By mid-August 2015, Johnson had arranged for Adams to be hired by FCA, after which time Adams became a UAW member. (ECF No. 36-4, PageID.429–439; ECF No. 36-10, PageID.1129). From that point forward, Adams remained employed by FCA but tasked to work at the NTC as a "Special Assigned." (ECF No. 36-10, PageID.1111.) According to the UAW, FCA employees who are temporarily assigned to the NTC "remain employees of the UAW or FCA" and "[t]heir paychecks are issued from and their benefits are set by the UAW or FCA." (ECF No. 36-1, PageID.228–229.) Furthermore, the NTC does not have the ability to hire or fire these workers and reimburses the UAW or FCA for their compensation. (*Id.*) Individuals who were assigned to the NTC made about $40 per hour even though a new hire in an FCA plant might start at $15 per hour. (ECF No. 36-4, PageID.432–433.)

Adams, who reported to UAW's Delrico Loyd, was part of a four-person department that consisted solely of UAW members. (ECF No. 36-10, PageID.1109,1131.) She was given certain responsibilities that used to be assigned to Golden, such as diversity training. (ECF No. 36-10, PageID.1113.) Golden and Adams also worked together on many projects, such as certain out-of-state trainings. (ECF No. 36-10, PageID.1116–1117.) Unlike Golden, Adams did not work on data entry. (ECF No. 36-10, PageID.1118.)

But Golden was not replaced by Michelle Adams. In fact, Golden's position remains vacant. (ECF No. 36-1, PageID.228.) "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Adams was not hired or reassigned to perform Golden's duties. Rather, Adams was assigned to the NTC starting in 2015, two years before Golden quit. And their job responsibilities did not overlap in many areas, such as Golden's data-entry tasks. Although Adams took over

certain duties that used to belong to Golden, "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id.* (quoting *Barnes*, 896 F.3d at 1465).

Nor were Golden and Adams similarly situated to each other. Whereas Golden worked for the NTC, Adams was employed by FCA. Since Golden and Adams had different employers, they were not similarly situated in all relevant aspects of employment. *See Ercegovich*, 154 F.3d at 352 (holding that comparators "must be similar in all of the relevant aspects" (emphasis and internal quotation marks omitted)); *Carter v. Arkansas*, 392 F.3d 965, 969 (8th Cir. 2004) (holding that two employees were not similarly situated because they had different employers).

So Golden cannot make out a prima facie case for this claim either.

In response to Golden's allegations, the NTC said that Adams took over some of Golden's job responsibilities for various non-discriminatory reasons, including the policy that only UAW members should train groups of exclusively UAW members. Golden herself believed that Adams was hired because of her family connections rather than her age. However, because Golden cannot satisfy step one of *McDonnell Douglas*, the Court need not proceed to step three (or even step two) regarding the age-discrimination claims.

**B.**

Second, Golden argues that the NTC violated the ADEA's antiretaliation provision. That section makes it "unlawful for an employer to discriminate against any of [its] employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under" the statute. 29 U.S.C. § 623(d).

The *McDonnell Douglas* burden-shifting framework applies to this claim, too, so the plaintiff first has the burden to make out a prima facie case of retaliation. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). The requirements of a prima facie retaliation case are "(1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id.* Moreover, the plaintiff must prove but-for causation. *See E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (explaining the standard in Title VII cases); *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (similarly construing the antiretaliation provisions of Title VII and the ADEA).

When an individual suffers an adverse employment action "very close in time" to the moment when her employer learned of her protected activity, there is sufficient evidence of a causal connection. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 650 (6th Cir. 2015) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Typically, causation is "satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007)). "But where some time elapses" between those two occurrences, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Yazdian*, 793 F.3d at 650 (quoting *Mickey*, 516 F.3d at 525).

Golden asserts that after she complained about her pay, the NTC retaliated against her by taking an adverse employment action.

The NTC concedes in its motion that Golden engaged in protected activity when she complained about her pay. However, the organization disputes that it took an adverse employment action toward Golden and, even if it did, it maintains there was no causal connection between that action and Golden's complaints about her pay.

The Court finds Golden's retaliation argument to be unavailing. For starters, it is not clear which conversation (or conversations) Golden is referencing. She spoke with two managers about her pay during the period from 2003 to 2006; in 2008, someone in management told her, "[T]here's not going to be any raises, and if you want, I could just lay you off"; sometime between 2010 and 2014, she told the co-director of the NTC that she was paid less than Jones; in 2011, she had a meeting about compensation with her coordinator and the UAW vice president; in 2012, she raised the issue of pay with the personnel director, who told her that if management reviewed her compensation, they might pay her less money based on figures from the Bureau of Labor Statistics; multiple times between 2011 and 2014, she met with her coordinator to request greater compensation; and in 2014, she complained about her pay to Delrico Loyd. (ECF No. 36-2, PageID.266–269; ECF No. 36-4, PageID.411–414; ECF No. 36-5, PageID.553–556; ECF No. 36-6, PageID.735–736, 848–850.)

As discussed, the undisputed record does not support a claim of constructive discharge. And even if the complained-about job changes constituted an adverse employment action, Golden cannot demonstrate causality. When the NTC removed Golden from trainings that involved only UAW members, it was mid-2015. As "some time elapse[d]" since the most recent complaints, Golden must "couple temporal proximity with other evidence of retaliatory conduct to establish causality." *See Yazdian*, 793 F.3d at 650. On this issue, Golden's brief is threadbare. Golden states only that the NTC knew about her complaints and that she afterward suffered an adverse

employment action. What is lacking is any evidence that somebody at the NTC who knew about her complaints took action *because* Golden complained. And in the case of some of Golden's complaints, many years passed before her job responsibilities changed. In other words, she cannot demonstrate that the harm would not have occurred "but for" her complaints. So she cannot make out a prima facie case of unlawful retaliation under the ADEA.

To be sure, the "burden of establishing a *prima facie* case in a retaliation action is not onerous." *Mickey*, 516 F.3d at 523. Still, even if Golden could demonstrate a prima facie case, she cannot satisfy the remainder of the *McDonnell Douglas* analysis. The NTC articulated a legitimate, nondiscriminatory reason for altering Golden's job responsibilities: a new policy that required a UAW member to conduct trainings of solely UAW members. This explanation satisfies the organization's burden of production under step two. *See id.* at 526. Under step three, the burden shifts back to Golden to show pretext. *See id.* To do so, Golden "must produce sufficient evidence from which the jury could reasonably reject [the NTC's] explanation and infer that [the NTC] . . . did not honestly believe in the proffered nondiscriminatory reason." *Id.* (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Regarding the new training guideline, Golden mainly asserts that she "never heard such a rule before" and it was "no coincidence" that she was the only person affected. (ECF No. 38, PageID.1248–1249.) But skepticism and unfamiliarity are not enough. She has not produced sufficient evidence that the NTC's stated reason was factually untrue, that the organization was actually motivated by another reason, or that the stated reason did not sufficiently explain why she

13

was removed from the trainings. Since no jury could reasonably reject the NTC's explanation as pretextual on this record, Golden's retaliation claim does not survive summary judgment.

## C.

Finally, the Court reviews Golden's allegation of sex discrimination under the Equal Pay Act ("EPA").

To establish a prima facie case under the EPA, a plaintiff must show that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)). To be considered equal work, two jobs may be "substantially equal" rather than "identical." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). In deciding whether two jobs are substantially equal, one looks to an "overall comparison of the work, not its individual segments." *Id.* at 359–60 (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)). If a plaintiff has established a prima facie case, the burden shifts to the employer to prove an affirmative defense. *See id.* at 360.

Alfred Jones retired in 2013 after having been a longtime NTC employee—and Golden's former supervisor. In his final year at the NTC, Jones earned a salary of $78,395.10. (ECF No. 38-5, PageID.1275.) Jones received bachelor's and master's degrees before joining Chrysler in 1984 as a trainer of new employees. (ECF No. 36-9, PageID.983–985.) He moved over to the NTC as a job training counselor in 1987, shortly after the center was established. (ECF No. 36-9, PageID.994.) The NTC paid Jones a salary, rather than an hourly wage, from the beginning of his employment. (ECF No. 36-9, PageID.1001,1004.) Early on, Jones helped to train facilitators,

reviewed applications for the Tuition Assistance Program, and started the Youth School-to-Work Program for high school students. (ECF No. 36-9, PageID.997–1000.)

Jones was Golden's supervisor for about one year starting in 1997, taking on added responsibilities and reviewing Golden's time cards. (ECF No. 36-6, PageID.679,706,749; ECF No. 36-9, PageID.1033.) In 1997, when he led the Educational Services Department, Jones listed three primary job responsibilities. He spent 40 percent of his time working on the "development, implementation and presentation" of six worker participation conferences. (ECF No. 36-17, PageID.1179–1182.) Jones devoted another 30 percent to his responsibilities as chair of the Tuition Assistance Program ("TAP"). (*Id.*) And he spent the remaining 30 percent of his time as the administrator of the School-to-Work Program, where he developed the budget, contracted with vendors, and scheduled classes. (*Id.*) During that time, Jones "always" reviewed the drafts of Golden's program materials "for additional suggestions and feedback." (ECF No. 36-19, PageID.1202.)

Jones soon returned to his previous position as a "training facilitator" or "educational services specialist," where he remained until his retirement. (ECF No. 36-9, PageID.984,1006; ECF No. 36-18, PageID.1196.) As described in Jones' position questionnaire from 2005, the last year provided in the record, his principal role was to provide "educational resources and support services to various NTC programs, including service as the Chair of the Proposal Evaluation Committee for [the Tuition Assistance Program]." (ECF No. 36-18, PageID.1196.) Among other tasks, he assisted in developing workshops for seven NTC programs, assisted in developing budgets, and designed print materials for conferences. (*Id.*) When asked to estimate how much of his work overlapped with that of Golden, Jones estimated about "10 to 15 percent" usually and no more than "30 percent" in a given year. (ECF No. 36-9, PageID.1054–1055.) Finally, Golden

15

acknowledged in her deposition that she and Jones "didn't have identical job responsibilities." (ECF No. 36-6, PageID.743.)

Before proceeding to the merits, the Court considers whether Golden timely filed her EPA claim. The statute of limitations is two years or, in the case of a willful violation, three years. *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 830 (6th Cir. 2019); 29 U.S.C. § 255(a). Since Golden does not allege willful conduct, the Court will consider her claims of unequal pay during the two years prior to Golden's filing of this suit, i.e., September 12, 2015, through September 12, 2017. Each unequal paycheck constitutes a violation of the EPA. *See Gandy v. Sullivan Cty.*, 24 F.3d 861, 864 (6th Cir. 1994).

Golden resigned effective May 31, 2017. (ECF No. 36-6, PageID.873–874.) But Jones, who is Golden's lone comparator, left the NTC on August 2, 2013. (ECF No. 36-16, PageID.1177.) August 2013, then, was the last time when Golden and Jones both received paychecks from the organization. So although Golden received many paychecks in the two years before September 12, 2017, Jones received none.

The NTC argues that Golden waited too long to bring her case. In at least one Sixth Circuit case, the defendant was granted summary judgment because the only man similarly situated to the female plaintiff had retired outside the statutory period. *See E.E.O.C. v. Penton Indus. Pub. Co.*, 851 F.2d 835, 838 (6th Cir. 1988). The court reasoned that "no male employee was thereafter paid more than a similarly situated female employee" and the plaintiff could not "demonstrate any present disparity in wages." *Id.* at 838–89.

A few years later, another in-circuit opinion somewhat limited *Penton* to its facts. *See Gandy*, 24 F.3d at 865 (holding that the court was "not constrained by *Penton*" because the plaintiff's comparator was a predecessor rather than a coworker). In that opinion, the court also

16

commented that "*Penton* does not suggest how the discrimination ceased since the female employees continued to be compensated at the discriminatory wage rate." *Id.* At least two other circuits follow the rationale of *Penton*. *See Snider v. Belvidere Twp.*, 216 F.3d 616, 618 (7th Cir. 2000) ("[T]he male's departure ends the allegedly discriminatory wage differential."); *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118–19 (2d Cir. 1997). On the other hand, one Fourth Circuit opinion strongly disagreed with *Penton* and held that a plaintiff could bring an EPA suit even though her comparator had retired outside the limitations period. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 345–51 (4th Cir. 1994); *see also id.* at 349 n.30 (criticizing *Penton* as being contrary to EEOC regulations).

But the Court need not resolve this issue because Golden cannot make out a prima facie case of sex discrimination. Simply put, she and Jones performed jobs that were not "substantially equal" and did not require "equal skill, effort, and responsibility."

By Jones's estimation, no more than thirty percent of his work overlapped that of Golden. Golden does not dispute this. In her response to the summary-judgment motion, she states that roughly "80% of each one's time was spent together training with teams, and the remainder of their time was spent on related activities." (ECF No. 38, PageID.1251.) She continues: "They conducted training at NTC and trained around the country with teams, conducting sessions in different plants, organizing conferences around the country." (*Id.*) But spending time together on projects does not equate to doing the same job. Nor do two members of the same team always have equal job functions. Jones also had many responsibilities that Golden never shared. At one point, Jones served as Golden's supervisor and reviewed her work. He served as the chair of a committee for the Tuition Assistance Program, administered the School-to-Work program, and assisted in

developing budgets. Golden never had these responsibilities. Her job also consisted of functions, like data entry, that were not a part of Jones's portfolio.

By making an "overall comparison of the work," *see Beck-Wilson*, 441 F.3d at 359, no reasonable jury could find that the jobs were substantially equal. In at least some instances, such as developing budgets, Jones's work required more "skill, effort, and responsibility" than Golden's. And without demonstrating that she and a male comparator did equal work, Golden cannot make out a prima facie case of sex discrimination.

## IV.

Because the Court finds that the NTC is entitled to judgment as a matter of law on all three counts, the motion for summary judgment is hereby GRANTED. Therefore, the case is DISMISSED.

SO ORDERED.

Dated: November 14, 2019

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
UNITED STATES DISTRICT JUDGE